## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ARLENE MILLER,          )
                                     )
             Plaintiff,    )     **Civil Action No. 09-1166**
                                     )
        v.                )     **Magistrate Judge Maureen P. Kelly**
                                     )
**MELLON LONG TERM DISABILITY**  )     **[ECF Nos. 54 and 57]**
**PLAN and GLOBAL HEAD OF,**      )
**COMPENSATION AND BENEFITS,**   )
                                     )
            Defendants.  )
                                     )

## OPINION

KELLY, Magistrate Judge

Plaintiff, Arlene Miller ("Miller" or "Plaintiff"), commenced this action alleging a violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). She contends that her long term disability benefits were wrongfully terminated and seeks a determination of her rights to past and future benefits under the terms of her former employer's disability insurance plan. Pending before this Court are cross-motions for summary judgment filed by Miller [ECF No. 57] and the Mellon Long Term Disability Plan ("the Plan") and Global Head of Compensation and Benefits (collectively, "Defendants") [ECF No. 54]. For the reasons that follow, Plaintiff's Motion for Summary Judgment is denied and Defendants' Motion for Summary Judgment is granted.

## I. BACKGROUND

Miller was employed by Mellon Financial Corporation ("Mellon") as a Senior Accounts Payable Coordinator until February 27, 2004. Beginning March 1, 2004, Miller reported that she was unable to work and applied for short-term disability benefits for an undisclosed illness. [ECF No. 56-2, p. 2]. These benefits were granted on March 26, 2004, for the period March 1, 2004, through April 21, 2004. [ECF No. 56-2, p. 15-16]. On April 22, 2004, Miller's primary care physician, Alan Seymour, M.D., responded to an inquiry from CIGNA, the Claims Administrator of the Plan, as to the nature of Miller's disability. Dr. Seymour opined that Miller was suffering from fibromyalgia pain and depression and estimated her return to work date as June 1, 2004. [ECF No. 56-2, p. 19]. Based upon his reporting, Miller's benefits were extended. [ECF No. 56-2, p. 24]. On June 24, 2004, Dr. Seymour submitted a follow-up report, stating that because of neuropathy and depression, Miller was referred to a neurologist and psychiatrist. Dr. Seymour also stated that Miller could return to work on August 1, 2004. [ECF No. 56-2, p. 29]. Miller's short term disability benefits were continued through July 31, 2004. [ECF Mo. 56-2, p. 30].

Two weeks before her return to work date, Miller submitted a claim for Long Term Disability ("LTD") benefits. On July 13, 2004, CIGNA requested that she submit additional medical information to support her claim. [ECF No. 56-2, p. 32]. CIGNA informed Miller that she would need to contact her physicians and ask for their cooperation in forwarding medical records so that CIGNA could receive the required documentation no later than August 27, 2004, the commencement of the LTD benefit eligibility period. Id. On August 4, 2004, CIGNA notified Miller that it had not yet received any medical documentation. [ECF No. 56-3, p. 2]. CIGNA also faxed a request for information to "Dr. Gudasblotch," a neurologist Miller indicated

she had consulted with on one occasion. Neither the neurologist nor Miller's primary care physician responded to CIGNA's request. CIGNA repeated its direct requests for medical information from Miller's physicians on August 27, 2004. [ECF No. 56-3, pp. 3, 10, 16]. On September 2, 2004, Sheila Miller, the Plan Manager, notified Plaintiff that as a result of the absence of medical documentation of her disability, her claim for LTD benefits was denied. [ECF No. 56-3, p. 28-31]. The notification detailed the Plan requirements concerning proof of disability as well as proof that she "is under the regular care and attendance of a legally qualified physician." [1] Additionally, Plaintiff was informed of her right to appeal the decision and the nature of appropriate medical evidence of disability.

---

[1]      The Plan provides Long Term Disability coverage to plan participants who meet certain eligibility criteria, in pertinent part, as follows:

     2.2     <u>Benefit Eligibility</u>. A Participant shall be ***initially*** eligible for benefits under the Plan if he satisfies [application requirements] ***and if all of the following conditions are met***:

     (a)     a Plan Manager determines that the Participant is Totally Disabled as defined in Section 2.3 as of a specific date prior to any cessation of participation required by Section 2.1(b) [relating to termination of employment, break in service, age restrictions , etc.];

     (b)     the Participant is Totally Disabled for a cumulative period of twenty-six (26) weeks of any consecutive or "rolling" eight (8) month period;

     (c)     a Plan Manager determines that such Total Disability is reasonably expected to continue for the foreseeable future;

     (d)     the Participant is Totally Disabled as a result of sickness or bodily injury …; and

     ***(e)     the Participant is under the regular care and attendance of a legally qualified physician***.
The continued eligibility of a Participant determined to be eligible to receive benefits under this Section 2.2 shall be determined in accordance with Sections 2.5 and 2.6.

     2.3     <u>Total Disability</u>. A Participant shall be considered to be "Totally Disabled" if he is wholly and continuously unable:

     (a)     during the first two (2) years of any one period of disability following eligibility to begin the receipt of benefits, to perform one or more of the essential duties of his employment as required at the time his absence commenced (as determined under Section 2.2 (b)); and

     (b)     during the remainder of such period of disability, to engage in any occupation or perform any work for compensation or profit for which he is or may become reasonably fitted by education, training, or experience.

     2.5     <u>Cessation of Eligibility for Benefits</u>. A Participant who has been receiving benefits hereunder shall no longer be eligible for benefits effective as of the earliest to occur of the following dates that the Participant:

     (a)     ceases to be Totally Disabled;

     (b)     fails to submit to one or more types of independent examinations….

     (c)     attains age sixty-five (65) (except as otherwise provided in Section 3.1);

     (d)     ***is no longer under the regular care and attendance of a legally qualified physician***;
….

***(footnote continues on next page)***

Eight weeks later, Miller submitted an appeal by letter dated October 29, 2004. Miller explained that because of continuing pain and depression, she was unable to work. [ECF No. 56-3, pp. 32-33]. She indicated that she had scheduled an appointment with a psychiatrist and had been seen by a neurologist. In response, on November 30, 2004, Mellon provided her with an additional 45 days to document her medical condition and to establish that her prior August 1, 2004, return to work date was not possible. [ECF Mo. 56-3, p. 34]. On February 28, 2005, Mellon informed Miller that it had not received any additional medical information and that her claim would be reviewed by its Corporate Benefits Committee based upon the information contained in her file to date, along with her appeal letter. [ECF No. 56-3, p. 37-38]. Subsequently, on March 23, 2005, the Plan Manager received a letter from M. Sabanayagam, M.D., a psychiatrist, who had examined Miller in December 2004, and determined that she exhibited signs of depression. [ECF No. 56-3, p. 39]. He diagnosed her with "Major Depression Single Episode," and indicated that she was under medication management and required supportive psychotherapy. Dr. Sabanayagum did not state that Miller was disabled but noted that she "is unable to concentrate in her job functions, easily forgetful poor attentions to her look very distractable. Since then she was seen four time [sic et passim]."

On or about April 13, 2004, Mellon learned that Miller had been denied Social Security Disability benefits, based on a finding of insufficient evidence that she could not work at a job that "would involve less stress." [ECF No. 56-3, p. 40-43].

In conjunction with Miller's appeal of the denial of LTD benefits, Life Insurance Company of North America, Mellon's LTD insurance carrier, scheduled an independent functional capacities evaluation ("FCE") with Gary Welch, PT. [ECF No. 56-3, p. 51]. The FCE

[ECF No. 56-1, pp. 14-16 (italics and emphasis added)].

exam revealed that "with the exception of lifting," she had no physical restraints. [ECF No. 56-4, pp. 3-4]. An independent psychological evaluation ("IME") was also scheduled with Robert Gordon, Psy.D., on May 14, 2005. [ECF No. 56-3, p. 51]. The psychological IME agreed that Miller was suffering from depression and that, in addition to her current medication regimen, she was in need of individual psychotherapy for a period of five months. [ECF No. 56-4, pp. 27-33]. Mellon's Plan Manager requested that CIGNA provide an assessment of the accuracy of the FCE and IME. [ECF No. 56-5, p. 9]. This "paper review" of both exams was performed by two separate teams comprised of a doctor, a registered nurse and an LTD case manager. While the FCE assessment team accepted the finding that Miller was physically capable of sedentary work, the IME review team determined that the findings of the psychological exam were inconclusive as to her inability to work due to depression and anxiety. [ECF No 56-4, pp. 36-39, ECF No. 56-5, p. 10].

On June 14, 2005, Mellon's Corporate Benefits Committee reviewed Miller's appeal, including her application for LTD benefits, the supporting medical documentation and IME, and the assessment teams' findings. The Corporate Benefits Committee reversed the original denial of LTD benefits and awarded LTD benefits retroactively from the date of Miller's initial eligibility in August 2004. [ECF No. 56-5, pp. 12]. In the determination letter, however, Miller was informed that pursuant to the terms of the Plan, after receiving LTD benefits for two years, the Plan would require her to then establish:

> on the basis of objectively verifiable medical evidence, your inability "to engage in any occupation or perform any work for compensation or profit for which he is or may become reasonably fitted by education, training or experience." This is generally referred to as the "hard test." Thus, after the two year period, even if you still cannot perform your former Mellon job, you would cease to be eligible for LTD Plan Benefits if you are determined to be capable of performing any job in the marketplace….

> CIGNA in its capacity as administrative services provider, will be contacting you in the second quarter of 2006 to start the process of collecting medical evidence to determine if your LTD Plan benefits must be continued after August 6, 2006, under the "hard test" described above.

[ECF No. 56-5, p. 13]. The Corporate Benefits Committee determination letter also stated that Miller "should appeal the denial of Social Security Disability benefits." As directed, Miller appealed the denial of Social Security Disability benefits. The appeal was successful, and on August 8, 2005, she was awarded Social Security Disability benefits retroactive to August 2004.[2] [ECF No. 56-5, pp. 14-15].

From the date Miller was granted LTD benefits in June 2005, through October 2006, there is no evidence that Miller remained under the "regular care and attendance of a legally qualified physician" as required by the Plan. Indeed, there is no evidence that Miller consulted or treated with her psychiatrist after his March 2005 letter to CIGNA regarding Miller's diagnosis of "single episode" depression. Similarly, on March 14, 2006, a CIGNA claim manager learned that while Miller was still complaining of depression and fibromyalgia, memory loss and confusion, she last saw Dr. Seymour, her primary care physician, in the fall of 2005 and she had not obtained any other medical treatment. [ECF No. 56-5, p. 18].

CIGNA contacted Dr. Seymour by facsimile dated March 14, 2006, requesting medical information and a physical ability assessment. [ECF No. 56-5, p. 19]. No response to this request was ever received.

On March 20, 2006, CIGNA wrote to Miller and reiterated that the definition of "Totally Disabled" would change for her disability claim in August 2006, and that for benefits to

---

[2] Pursuant to the terms of the Plan, Defendant's liability for LTD benefits was offset by the amount of Social Security Disability benefits received by the Miller each month.

6

continue, she would be required to establish that she was unable to engage in "any occupation." [3] For purposes of making this determination, CIGNA requested information regarding the identity and contact information for any treating physicians, and asked that Miller sign appropriate authorizations to release medical information. [ECF No. 56-5, p. 20]. Miller submitted a Disability Questionnaire dated March 20, 2006, which listed Dr. Seymour as the only physician she "see(s) regularly" and noted her last visit as September 2005. [ECF No. 56-6, pp. 23-27]. In addition, Miller stated that her only medication was Advil, taken twice a day. Miller did indicate that she was still suffering from fibromyalgia and depression and that she was in pain "all the time." She complained of "very limited short term memory" and feelings of confusion, being overwhelmed and depressed. Id. In terms of her level of activity, Miller reported that she was able to cook two hours a day, five times a week; clean her home one to two hours a day, two days a week; shop two hours once a week; launder one hour once a week; and watch television three hours a day, five or six days per week. She also dined out twice a week. In addition, she took walks three times a week for 30 minutes or less. Id.

On September 12, 2006, two weeks after the expiration of the initial two-year LTD benefit period, CIGNA again wrote to Dr. Seymour requesting copies of medical records, a treatment plan and an estimated return to work date. [ECF No. 56-5, p. 29]. No response to this request was received. While it does not appear from the record that CIGNA attempted to contact Miller's former psychiatrist, Dr. Sabanayagam, Miller indicated in her March 2006 Disability Questionnaire that she had ceased psychiatric treatment.

Having received no medical evidence to support Miller's claim of continued disability under the "any occupation" standard, Sheila Miller, Mellon's Plan Manager, wrote to Plaintiff on

---

[3] See, definition of "Totally Disabled," *fn* 1, supra.

October 12, 2006, and informed her that the October 15, 2006, LTD payment would be her last. [ECF No. 56-5, pp. 41-45]. The Plan Manager's letter detailed CIGNA's attempts to reach Miller's physician and his failure to submit any updated records. Because the last medical information on record was the CIGNA-sponsored IME and FCE from May 2005, Miller was advised there was insufficient evidence that she could not perform "any occupation" and therefore insufficient evidence that she was "totally disabled" as defined by the Plan. Miller was provided with the appeal procedure, as well as a list of examples of acceptable supporting medical documentation which could establish her inability to perform the duties of "any occupation."

On March 15, 2007, one month before the expiration of the appeal period, Miller filed a lengthy appeal letter. The letter detailed Miller's continued complaints of pain from fibromyalgia and depression, memory loss and difficulty sleeping. [ECF No. 56-5, pp. 46-51]. She complained of CIGNA's failure to contact Dr. Seymour (Miller's primary care physician), Dr. Sabanayagum (Miller's former psychiatrist) and Dr. Gudasblotch (Miller's neurologist, seen once in 2004). She listed three new doctors and a physical therapist that were now providing care, including Dr. Mark Siegelheim, an internist; Dr. Rosenberg, a physiatrist; Dr. Sandberg, a psychologist; and South Side Physical Therapy. She also indicated her willingness to undergo additional independent medical evaluations.

The March 2007 appeal commenced a second round of repeated requests by CIGNA for medical information and limited responses from Miller's physicians, which delayed full consideration of the appeal for an additional six months. [ECF No. 56-6, pp. 2-6]. On May 14, 2007, CIGNA requested copies of office notes, treatment plans, restrictions and limitations preventing Miller from returning to work, as well as an estimated return to work date from Drs.

Sandberg, Rosenberg and Siegelheim (her the newly identified doctors), Dr. Gudasblotch and South Side Physical Therapy. [ECF No. 56-6, pp. 8-11]. On May 31, 2007, Miller was notified that none of her physicians had responded, and that her assistance was necessary to gather information for the review of her appeal. [ECF No. 56-6, p. 12]. This request was renewed by letters dated June 12, 2007, July 10, 2007, and August 6, 2007. With the exception of South Side Physical Therapy, which had provided treatment records, no responses were received. On July 24, 2007, the Plan Manager sent Miller an extension letter, providing her one last opportunity for her doctors to respond. [ECF No. 56-6, pp. 22-23]. It appears that CIGNA finally received treatment information from Drs. Siegelheim, Rosenberg and Sandberg on August 14, 2007. The records obtained from these "new" doctors indicate that Miller complained of feeling depressed and in moderate pain. However, none of the "new" doctors expressed the opinion that Miller was either currently disabled or that she had been disabled at her "any occupation" Total Disability date of August 2006. [ECF No. 56-6, pp. 26-48, ECF No. 56-7, pp. 2-17].

The treatments records show that after receiving the notification of termination of her benefits, Miller first went to Dr. Siegelheim, stating that she "need[ed] an internist," and had "ques[tions] to ask the Dr." [ECF No. 56-6, p. 48]. Her health history on that date indicated that her only medication was a multivitamin and Advil. Dr. Seigelheim's notes indicate that in the past, she had been diagnosed with fibromyalgia. Miller reported that she was feeling pain, felt depressed, and was having memory issues. Id. Dr. Siegelheim referred her to Dr. Rosenberg, who noted that Miller's physical exam was normal, except that she had 16/18 tender points throughout her upper and lower body. [ECF No. 56-7, pp. 15-16]. Dr. Rosenberg's impression was to "[r]ule in fibromyalgia with underlying depression" and advised her to begin

taking Lexapro. He referred Miller for cognitive testing for her perceived memory deficits. Dr. Rosenberg did not state that Miller was disabled, and he suggested physical therapy and aerobic exercises. Miller saw Dr. Rosenberg again in January 2007. Dr. Rosenberg reported that while she had been feeling better and her mood was improved from his prior examination, Miller indicated she had recently experienced increased pain. Dr. Rosenberg again encouraged her to "focus on performing aerobic type exercises in addition to muscle strengthening and flexibility exercises" and to continue physical therapy twice a week to obtain a home exercise program and perform myofascial release to painful trigger points as necessary. During subsequent appointments in March, May and July 2007, Miller continued to complain of pain, but was tolerating exercise two to three times a week and reported that she was not waking up with pain. [ECF No. 56-7, pps. 8-13]. There is no evidence that Dr. Rosenberg ever concluded Miller disabled or that he indicated her condition would prevent her from any form of employment or activity.

Dr. Mark A. Sandberg, Ph.D., a psychologist that Miller first consulted *after* receiving the October 12, 2006, letter notifying her of the termination, reported:

> Findings from neuropsychological examination are difficult to interpret with any degree of certainty in light of the fact that Ms. Miller scored abnormally on tests of motivational integrity. As such the results cannot offer a clear and definitive picture as to her underlying neurocognitive assets and liabilities.
>
> I do believe, with confidence that there is prominent mood dysphoria, which needs clinical attention and in my feedback to Ms. Miller, I underscored this opinion. I have given her the name of referrals in her area and she is aware of my ongoing availability should she require further assistance.
>
> At some point in time, when Ms. Miller is prepared to put forth her complete effort, she may wish to consider re-assessment of her cognitive functions.

[ECF No. 56-6, p. 42].  Dr. Sandberg did not opine that Ms. Miller's depression was disabling, or that it prevented her from engaging in any employment related activity.  He also did not provide an estimated length of disability.  [ECF No. 56-4, pp. 40-43, ECF No. 65-2, p. 1].  Dr. Rosenberg later opined in June 2007 that Miller's EMG studies showed signs of "moderate carpal tunnel syndrome," but again, he did not opine that Miller was disabled or unable to perform any activity.  [ECF No. 56-7, p. 4].

The Plan Manager submitted Miller's new medical records to CorVel Corporation, requesting a professional review.  Donald J. McGraw, M.D., conducted the independent review and determined that there was "insufficient medical or clinical evidence to support Ms. Miller's claim of being totally disabled to work in any occupation."  [ECF No. 56-7, pp. 23-26].

The totality of the records submitted to CIGNA by Miller or on her behalf reveal the absence of any medical documentation of disability or the inability to perform any type of routine employment related task on or after August 2006.  Further, Miller's records show that until her LTD benefits were terminated, Ms. Miller was not "under the regular care and attendance of a legally qualified physician."  Finally, as her own psychologist opined, Miller scored "abnormally on tests of motivational integrity" rendering her psychological testing assessment unreliable.  Her doctor did offer the opportunity to retake the test to assist in documenting her purported disability, but evidently Miller did not follow through.  Accordingly, by letter dated October 29, 2007, Mellon notified Miller that her appeal of the termination of her LTD benefits had been denied.  [ECF No. 56-8, pp. 14-27].

## II.    MOTIONS FOR SUMMARY JUDGMENT

In her Motion for Summary Judgment, Miller contends that the Plan wrongfully terminated her LTD benefits.  She alleges that the Plan's decision to terminate the benefits was

arbitrary and capricious because Defendants (1) failed to take into account that she had previously been granted both short and long term disability benefits as well as Social Security Disability benefits; (2) there was no evidence that her condition had changed; (3) Defendants failed to require a new medical examination prior to terminating her long term disability benefits and then relied upon an independent unqualified physician to conduct a chart review in making its determination; (4) there is no "objective" medical evidence to prove fibromyalgia, and so requiring such evidence was error; and, (5) because of the structural and procedural conflicts of interest, Defendants were improperly motivated to discontinue benefits.

Defendants argue that summary judgment should be entered in their favor because the Plan Administrator properly determined that Miller was no longer entitled to LTD benefits. Defendants contend Miller failed to establish that she was "unable to engage in 'any occupation'" and therefore that she was "Totally Disabled" as defined by Plan § 2.5(a). In addition, Defendants contend that the termination of LTD benefits was appropriate because, at the time of the determination, Miller was not "under the regular care and attendance of a legally qualified physician" as required by Plan § 2.5(d).

III.    **SCOPE AND STANDARD OF REVIEW**

ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court." Metropolitan Life Insurance Co. v. Glenn, 554 U.S. 105, 128 S.Ct. 2343, 2346, 171 L.Ed.2d 299 (2008). "Principles of trust law require courts to review [such a denial] 'under a *de novo* standard' unless the plan provides to the contrary." Id. at 2348 (quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)). "Where the plan … grant[s] 'the administrator or fiduciary *discretionary authority* to determine eligibility for benefits, trust principles make a *deferential standard* of review

appropriate.'" Id. (quoting Firestone, 489 U.S. at 111, 109 S.Ct. 948) (internal citations omitted)(emphases in original).

Nevertheless, "[o]ften the [adjudicatory] entity … both determines whether an employee is eligible for benefits and pays benefits out of its own pocket." Id. at 2346. "[T]his dual role creates a conflict of interest." Id. However, we "continue to apply a deferential abuse-of-discretion standard of review in cases where a conflict of interest is present." Schwing v. Lilly Health Plan, 562 F.3d 522, 525 (3d Cir. 2009). In those situations, we "take the conflict into account not in formulating the standard of review, but in determining whether the administrator or fiduciary abused its discretion." Id.; see also Doroshow v. Hartford Life & Accident Ins. Co., 574 F.3d 230, 234 (3d Cir. 2009)(rejecting a "sliding scale" approach and applying Glenn by noting that a "reviewing court should consider the conflict of interest – but only as one consideration of many." ).

On July 16, 2010, the Court issued a ruling that the Plan "clearly gives the administrator the discretion and authority to make determinations of fact," and, that while a structural conflict of interest is presented because the defendant both determines whether an employee is eligible and funds the benefits out of its own pocket, "there is no evidence of an actual conflict." [ECF Nos. 44, 51]. Therefore, as both parties concede, the relevant inquiry with regard to the instant motions for summary judgment is whether the decision to deny long term disability benefits to Miller was "arbitrary and capricious." [ECF No. 58 p. 13; ECF No. 55, p. 11].

In applying the arbitrary and capricious stand of review, a court may overturn a decision of the Plan Administrator only if "it is without reason, unsupported by substantial evidence or erroneous as a matter of law." Miller v. American Airlines, Inc., 632 F.3d 837, 845 (3d Cir. 2011). "A decision is supported by 'substantial evidence' if there is sufficient evidence for a

reasonable person to agree with the decision." Houser v. Alcoa, Inc. Long Term Disability Plan, No. 10-160, 2010 WL 5058310 (W.D. Pa. Dec. 6, 2010)(Ambrose, J.). Additionally, claims of procedural errors or a conflict of interest may not "tip the scales in favor of finding that the [administrator] abused its discretion[,]" where there is an abundance of evidence in support of the administrator's decision. Miller v. American Airlines, Inc., 632 F.3d at 846, quoting Schwing v. Lilly Health Plan, 562 F.3d at 526. Finally, under this narrow scope of review a court is not free to substitute its own judgment for that of the administrator in determining eligibility for plan benefits. Vitale v. Latrobe Area Hosp., 420 F.3d 278, 286 (3d Cir. 2005); Graham v. Guardian Life Ins. Co. of America, No. 2:06-CV-129, 2007 WL 2905891 at *4 (W.D.Pa. Sept. 28, 2007)(Cercone, J).

In deciding the parties' cross-motions for summary judgment, the Court may enter judgment when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Court must view all inferences in a light most favorable to the non-moving party. See Marzano v. Computer Science Corp., 91 F.3d 497, 501 (3d Cir. 1996). The non-moving party, however, may not rely on bare assertions, conclusory allegations or mere suspicions to support its claim but must demonstrate by record evidence the meritorious nature of the claim. Orsatti v. New Jersey, 71 F.3d 480, 484 (3d Cir. 1995).

## IV.    DISCUSSION

Because the Plan at issue places the burden on the claimant to submit medical evidence of eligibility for benefits, Miller must prove she was entitled to, but arbitrarily and capriciously denied, disability benefits. Abnathya v. Hoffmann-La Roche, Inc., 2 F.3d 40, 46 (3d Cir. 1993) (benefits properly denied where record indicates claimant never submitted evidence that

condition causes total disability).    To determine whether Miller has carried her burden, the Court must look to the record as a whole. Mitchell v. Eastman Kodak Co., 113 F.3d 433, 440 (3d Cir. 1997) (*abrogation on other grounds recognized in* Miller v. American Airlines, Inc., 632 F.3d 837, 847 (3d Cir. 2011)). It is fundamental that in reviewing Defendants' decision to deny Miller LTD benefits, the Court is limited to reviewing only the evidence that was before the administrator at the time the decision was made. See Courson v. Bert Bell NFL Player Retirement Plan, 214 F.3d 136, 142 (3d Cir. 2000); Graham v. Guardian Life Ins. Co. of America, No. 2:06-CV-129, 2007 WL 2905891 at *5 (W.D. Pa. Sept. 28, 2007).  Defendants argue that the decision to terminate Miller's benefits was reasonable, supported by ample record evidence and, therefore, not arbitrary and capricious.  After a careful and thorough review of the administrative record and the submissions of the parties, the Court agrees.

From the inception of Miller's claim for short-term disability benefits in March 2004, and her subsequent claim for LTD benefits, she was advised of the necessity to provide medical documentation of her disability under the terms of the Plan.  In March 2006, six months prior to the date Miller was required to establish that her depression and fibromyalgia prevented her from working at "any occupation," CIGNA again notified Miller of the documentation requirement. A cursory review of Miller's claim records reveals that Miller was consistently informed of the required documentation to support a finding of impairment that would prevent her from returning to "any occupation."   The Plan gave Miller the opportunity to submit additional medical information to support her claim and, indeed, repeatedly reached out to her identified medical providers, to no avail.

Despite these requests, Miller provided relatively few records to document her continued impairment and those records which were eventually submitted contain no information directly

relating to her health for the period June 2005 through November 2006. Miller's answers to the Plan Disability Questionnaire in March 2006 revealed that her condition was variable and seemingly improved. Indeed, while she complained that her feelings of depression continued, she had ceased treatment with a psychiatrist, and had last seen her family doctor six months earlier, in September 2005. By March 2006, Miller reported that her only medication was Advil, taken twice a day, along with a multivitamin, in contrast to her initial Disability Questionnaire in 2004, where Miller reported taking Paxil, Codeine, Singulair and another medication. [ECF No. 56-3, p. 7; ECF No.56-5, p. 26]. Furthermore, Miller's medical records show that following the initial award of LTD benefits in June 2005, she did not seek treatment for any of her "disabling" conditions until October 2006, *after* her LTD benefits were terminated and when she evidently began the preparation of her subsequently filed appeal.

An ERISA Plan requirement that a claimant be under the "*the regular care and attendance of a legally qualified physician*" has been found to assist in the determination of a claimant's status as disabled. "We are convinced that the purpose of the clause requiring the insured to be 'under the regular care and attendance of a physician' is to determine that that the claimant is actually disabled, is not malingering, and to prevent fraudulent claims." Heller v. Equitable Life Assur. Soc. of US, 833 F.2d 1253, 1257 (5th Cir. 1987). Here, because Miller was not under the "regular care and attendance" of a physician in the 15 months leading up to her August 2006 "any occupation" date, there are *no* records to establish that Miller was actually and permanently disabled in August 2006 (or anytime thereafter). Indeed, while Miller's medical records may have supported a finding that because of her depression and/or fibromyalgia, she was disabled from her "own occupation" in early 2005, Miller presented no evidence to support the payment of LTD payments after August 2006, as there is no medical

finding that Miller was disabled from "any occupation." See, e.g., Ketterman v. Affiliates Long-Term Disability Plan, No. 08-CV-1542, 2009 WL 3055309, at *13 (W.D. Pa. Sept. 21, 2009).

The absence of a medical finding that Miller was disabled from "any occupation" stands in stark contrast to those cases where an administrator's termination of benefits was reversed based on the substantial evidence presented. In Miller v. American Airlines, Inc., 632 F.3d 837 (3d Cir. 2011), the claimant was a pilot who had suffered a psychotic episode while on duty and was subsequently admitted to the hospital. He was prescribed various medications as part of his treatment regimen, and his FAA medical certification, a requirement for all commercial pilots, was revoked. The pilot was awarded LTD benefits in 1998. However, in 2003, after his condition stabilized without medication, American informed him that it could no longer substantiate his disability and terminated his benefits. The claimant forwarded medical documentation that he was stable, but indicated that he remained under a doctor's care and remained ineligible for FAA certification. Accordingly, American reinstated claimant's benefits. Two years later, the claimant's doctor filed progress reports with American, again noting that the claimant was seen monthly, was asymptomatic and was not taking medication. American subsequently terminated benefits, concluding that it was unable to verify the "existence of a continuing medical disability." Id., 632 F.3d at 842. The claimant responded, forwarding a letter from his doctor that he "has been continually and [ ] permanently disabled from obtaining a Class One Medical Certificate as required by F.A.A. regulation since August of 1988. According to Dr. Gonzolez, Miller continued to suffer from anxiety and psychosis, as he had since his original diagnosis." Id. Dr. Gonzolez reported that the necessity for claimant's treatment "has and will continue to exist because of the nature of his psychiatric conditions" and

that his prognosis was fair.  Id.  In balancing the substantive and procedural factors affecting American's decision to terminate benefits, the United States Court of Appeals for the Third Circuit determined that American had acted in an arbitrary and capricious manner.

The Court of Appeals for the Third Circuit turned first to the claimant's argument that the termination was not based on substantial evidence.  The Court agreed with the claimant,  noting that the evidence of his condition had not changed in the years since LTD benefits had been granted and that "American's reliance on the term 'asymptomatic' as the linchpin of Miller's ineligibility for disability benefits is, therefore, misplaced."  Id. at 846.   "Although Dr. Gonzolez reported that Miller was no longer taking medication, *he consistently stated that Miller was still under his care.  Indeed, American noted twice after receiving records from Dr. Gonzolez that Miller was unable to return to work as a pilot*.  In addition, American's internal records repeatedly state that Miller was diagnosed with anxiety and brief reactive psychosis.  … Finally *Dr. Gonzolez's letter in support of Miller's appeal to the PBAC notes that his psychiatric conditions are permanent and that continued treatment is necessary to stabilize his health*."  Id. (italics added).

In the absence of substantial evidence to support the American plan administrator's finding, the Court then went on to consider the purported procedural irregularities in the decision-making process, including the administrator's conflict of interest and the nature of evidence relied upon.  The Court found error in, *inter alia*, the plan administrator's reliance upon the same type of documentation to support a finding of disability in 1999 and again in 2003, but then using that identical documentation to terminate benefits in 2006.  "American admitted that it could not determine whether there was any change that occurred in [claimant's] psychiatric condition between January 2003 and May 2007. . . . We recognize that American's initial

18

payment of Miller's benefits does not operate as an estoppel such that they can never terminate

benefits.  But, in the absence of any meaningful evidence to support a change in position,

American's abrupt reversal is cause for concern that weights in favor of finding that its

termination decision was arbitrary and capricious."  Id.

Similarly, in Loomis v. Life Insurance Company of North America, No. 09-CV-3616,

2011 WL 2473727 (E.D. Pa. June 21, 2011), the Court held that where the plan administrator

failed to consider updated medical documentation from a claimant's treating physician and

gastrointestinal specialist, it acted arbitrarily and capriciously in terminating benefits.  Both of

claimant's doctors opined that the she was "totally unemployable" due to her depression,

memory loss, lack of concentration, irritable bowel syndrome and unexplained significant weight

loss.  Accordingly, the Court held that the decision to terminate benefits was not supported by an

abundance of evidence and therefore close examination of alleged procedural errors in its

decision-making process was required.  Id. at *6-*7. [4]

Here, in contrast, there are no medical records or opinions offered by any of Miller's

doctors indicating that she is disabled from "any occupation" because of her depression or

fibromyalgia. Defendants offered Miller every opportunity to present evidence of her disability

and, indeed, repeatedly reached out to her physicians seeking a medical opinion concerning her

disabled status.   The record, therefore, supports a finding that the decision to terminate benefits

was neither "arbitrary" nor "capricious" but, instead, was amply supported by substantial

evidence that Miller had not met her burden to demonstrate that her health prevented her from

---

[4] See also Haisely v. Sedgwick Claims Management Services, Inc., No. 08-CV-1463, 2011 WL 818669
(W.D. Pa. March 2, 2011)(Conti, J)(plan manager's termination was held arbitrary and capricious  where it
rejected opinions of three treating health-care providers that claimant was currently disabled,
inconsistently treated medical evidence supporting disability in the initial stages of claim, failed to consider
concurring social security disability decision, failed to request an IME and relied on the opinions of four
non-examining physicians).

obtaining employment in "any occupation" in August 2006, or that she was entitled to continued LTD benefits thereafter.

## V.    PLAINTIFF'S ARGUMENTS

Miller advances several arguments in support of her position that Defendants' denial was arbitrary and capricious. Specifically, Miller argues that:

(1) There is no evidence that her condition changed and so it was improper to terminate benefits based on the identical medical information used to initially grant benefits;

(2) The Plan's decision was not based on a "full and fair" review of Miller's claim because:

A.  The Plan did not require a second IME to support its conclusion that her medical condition had changed;

B.  The CBC relied on a "chart review" by a doctor who was not an expert in fibromyalgia or depression;

C.  The Plan relied upon Plaintiff's failure to provide "objective" evidence of fibromyalgia where none exists;

D.  The record shows procedural irregularities revealing an overly aggressive effort by the Plan to discontinue benefits, including the failure to consider that Plaintiff had been awarded Social Security Disability benefits when it decided to terminate the LTD benefits.

After careful consideration and for the reasons set forth below, the Court finds these arguments are unpersuasive.

### A.   Absence of evidence that condition changed.

Miller contends that in the absence of medical evidence that her condition improved, the Defendants' reversal of position without additional medical evidence was arbitrary and capricious. It is clear, however, that Defendants did not "reverse" their position; instead, while Miller had presented evidence that she was initially disabled from her "own occupation," she

provided no evidence that she continued to be disabled in August 2006, or that she was disabled from "any occupation" as required by the Plan. There is no evidence that she was under the treatment of any doctor after the initial award of benefits and, indeed, not one of her "treating physicians" opined that she was disabled at any point after early 2005. Her responses to the March 2006 Disability Questionnaire revealed that she was no longer taking medication beyond Advil, twice a day, and that she had stopped treating with her psychiatrist at some point after the initial grant of LTD benefits in June 2005. Moreover, even after the Plan and CIGNA provided Miller and her physicians with numerous opportunities to supplement the record with medical evidence of disability, they failed to do so. Accordingly, given the complete absence of evidence that Miller was disabled from "any occupation," Defendants' decision to terminate benefits was adequately supported. See, e.g., Ketterman v. Affiliates Long-Term Disability Plan, No. 08-CV-1542, 2009 WL 3055309, at *13 (W.D. Pa. Sept. 21, 2009).

Miller also argues that in the absence of current medical information proving her condition had changed, given her depressed state, the Plan should have ordered a second IME to confirm that she was no longer disabled. [ECF No. 58, 16-17] Notably, Miller does not cite to any authority for the proposition that where there is no current medical opinion of disability, a plan administrator's failure to order an IME is "arbitrary" or "capricious." Certainly, it has been held that the failure of a plan administrator to procure an IME before denying a claim may "raise questions about the thoroughness and accuracy of the benefits determination," especially where the condition at issue, like depression or fibromyalgia, is not amenable to a file review. See, e.g., Haisely v. Sedgwick Claims Management Services, Inc., No. 08-1463, 2011 WL 818669 (W.D. Pa. March 2, 2011). However, in Haisley, this conclusion was predicated upon the existence of a timely medical opinion that the claimant's condition made it impossible to sustain gainful

employment. Indeed, the claimant's physician opined, "Ms. Haisley views her current absence from work as a necessity, and this is the recommendation of both Dr. Majkic and myself. Ms. Haisley's absence from work is thus a collaborative decision. I am hopeful that Ms. Haisely's depressive symptoms will eventually remit, but at the present time and foreseeable future I do not believe she can perform her work."  Id., at *4. Here, in the absence of a single physician opinion of current disability from "any occupation," the failure to pay for and provide an IME to confirm that Miller was not disabled does not reflect an absence of thoroughness or accuracy and, accordingly, does not present a factor to be weighed in favor of Miller.

Miller further contends that the termination decision improperly "ignored additional indicia of disability evidenced by the previous award of Social Security Disability benefits." [ECF No. 58, p. 17].  As a preliminary matter, the existence of a Social Security award does not render a plan administrator's decision to terminate benefits arbitrary and capricious.

> The legal principles controlling the Social Security analysis differ from those governing the ERISA analysis, and, thus, the Social Security Administration's determination of "disability" is not binding on an ERISA benefit plan.  *See, e.g., Burk v. Broadspire Servs., Inc.,* 342 F. App'x 732, 738 (3d Cir.2009) (failure to consider award of Social Security Disability benefits not abuse of discretion); *Pokol v. E.I. Du Pont De Nemours & Co.,* 963 F.Supp. 1361, 1380 (D.N.J.1997) ("[I]t is not inherently contradictory to permit an individual to recover benefits pursuant to the Social Security Act while being denied benefits pursuant to a private ERISA benefit plan."); *Krensavage,* 2006 WL 2794562, at *9 ("[C]ourts have consistently held that ERISA plan administrators are not bound to follow Social Security Disability determinations in view of the different standard applied under that program."); *Graham,* 2007 WL 2905891, at *9.[FN15] ….
>
> FN15. Among other things, unlike ERISA, the Social Security analysis gives priority to the opinions of treating physicians. *See, e.g., Herman v. Metropolitan Life Ins. Co.,* 689 F.Supp.2d 1316, 1326 (M.D.Fla.2010) (citing *Black & Decker Disability Plan,* 538 U.S. at 833-34)); *Rupert,* 2006 WL 910405, at *9 (same); *see also Sollon v. Ohio Cas. Ins. Co.,* 396 F.Supp.2d 560, 587 (W.D.Pa.2005) (noting critical differences between Social Security disability program and ERISA benefit plans).

> In addition, nothing in the Social Security or disability pension award letters
> Plaintiff provided to the Plan renders the Plan's failure to place weight on the
> awards arbitrary and capricious. With respect to the former, the record is devoid
> of any reference to the materials upon which the Social Security Administration
> relied in reaching its disability determination. Similarly, there is no record
> evidence that Plaintiff supplied the Plan with any additional information
> underlying the disability pension award such as the effective date of disability or
> the medical information upon which the retirement plan relied. Coupled with the
> different legal principles applied in the Social Security context and the differences
> between the terms of the LTD plan and the Alcoa retirement plan (including the
> plan definitions of "total disability"), this lack of information is consistent with
> the Plan's conclusion that the record evidence was insufficient to support a finding
> of total disability beginning in June 2003 for purposes of LTD benefits.

Houser v. Alcoa, Inc. Long Term Disability Plan, No. 10-CV-160, 2010 WL 5058310, at *14

(W.D. Pa. Dec. 6, 2010). The record here reflects that on August 8, 2005, Miller was granted

monthly Social Security benefits. However, as in Houser, there is no evidence that Miller

supplied Defendants with the medical records upon which the Social Security Disability

determination was made. Further, the agency determination of her disability in August 2005 has

no bearing on whether she remained "Totally Disabled" as defined by the Plan in August 2006,

especially where there are no records reflecting any medical treatment for the intervening time

period and no opinion from any doctor that she continued to be disabled from "any occupation".

Accordingly, the prior award of Social Security Disability benefits does not render Defendants'

termination of LTD benefits inconsistent or arbitrary.

**B. Absence of a "full and fair" review.**

Miller's arguments that Defendants failed to provide a full and fair review prior to

terminating her benefits are unavailing. First, the record is replete with examples of the Plan

Manager and Administrators' repeated attempts to obtain updated medical records in furtherance

of an accurate review of Miller's condition. Records which were eventually obtained confirmed

that Miller was not declared "disabled" by any treating physician and she had not been under the

continuing care of a physician until she was notified that her benefits were being terminated. Second, Miller's examples of purported inadequate review do not support a finding that the termination of benefits was in violation of ERISA regulations or that it was "arbitrary and capricious." As discussed *supra*, Defendants' failure to require an IME to support a finding of disability does not render the review of her claim suspect. Miller has not pointed to any plan provision or legal authority imposing a duty on Defendants to order an IME where a physician has not first opined that a claimant is disabled from "any occupation."

Plaintiff also contends that Defendants inappropriately relied upon an independent physician, Dr. Donald McGraw, to review her medical records, because he has not been shown to specialize in either depression or fibromyalgia. Miller points to the Dr. McGraw's Master of Public Health degree as somehow disqualifying him from rendering an opinion, ignoring the evidence that he is also a Fellow of the American College of Preventative Medicine, a Fellow in the America College of Occupational and Environmental Medicine, as well as an Associate Professor in the Graduate School of Medicine at the University of Pittsburgh. [ECF No. 58, p. 23; ECF No. 56-8, p. 24]. The Court is satisfied with the credentials of the reviewing doctor and his ability to opine that the records submitted on Miller's behalf fail to sufficiently document that she was disabled from "any occupation." This is not a situation where a treating specialist's opinion of disability is dismissed by a non-treating, reviewing doctor of another specialty. Instead, here there is no countervailing opinion that Miller was, in fact, disabled from "any occupation" at any point after her initial grant of benefits in June 2005. Defendants' reliance on the independent chart review therefore does not indicate that the decision to terminate benefits was either arbitrary or capricious.

Miller contends that Defendants inappropriately required her to submit objective medical evidence that her fibromyalgia disabled her, when as she contends, it is generally recognized that there is no objective evidence of the condition.  [ECF No. 58, p.24].  Miller, however, fails to consider that Defendants did not require objective evidence of fibromyalgia, but simply required evidence, in the form of a treating physician's opinion, that she was disabled from "any occupation" subsequent to August 2006 and under the continuing treatment of a doctor. Plaintiff's mistaken reliance upon Ott v. Litton Industries, Inc., No. 4:04-CV-763, 2005 WL 1215958, at *19 (M.D. Pa. May 20, 2005) demonstrates the weakness of her argument.  In Ott, the Court found that the defendants had acted arbitrarily and capriciously in requiring objective evidence concerning a diagnosis of fibromyalgia, because the nature of the disease is subjective. However, the claimant had ample medical evidence of disability, including the opinions of her treating physician and three other examining specialists that she was unable to work:

> Dr. Ellis, Plaintiff's primary care physician, treated Plaintiff for several years, and his fibromyalgia diagnosis was corroborated by three specialists who all examined Plaintiff, a board-certified rheumatologist, a neurologist, and a pain management specialist.

> Additionally, Dr. Ellis and Dr. Calvert, Plaintiff's psychiatrist, specifically address Plaintiff's ability to work. First, Dr. Ellis extensively addressed the subject as we previously mentioned and concluded that Plaintiff's condition would be worsened by any gainful employment, including a full-time sedentary position, although we note that Defendants argue his opinion lacks an explanation as to why Plaintiff is unable to perform gainful employment. Second, after having seen Plaintiff for approximately one year, in her April 24, 2003 letter to Plaintiff's counsel, Dr. Calvert stated that she has no hesitation in saying that Plaintiff could not possibly manage to work a full-time job in any field, and even a part-time job would not be feasible. Dr. Calvert also noted that Plaintiff does not appear to be embellishing her symptoms for some secondary gain

Ott v. Litton Industries, Inc., 2005 WL 1215958, at *18 (M.D. Pa. May 20, 2005).  Here, Miller cannot point to a medical opinion regarding the effect of employment on her condition as,

indeed, none of her physicians opined that either her depression or her fibromyalgia prevented her from working in any full or part-time job. In the absence of a medical opinion of disability as of August 2006, Defendants' requirement of proof was neither arbitrary nor capricious.

Finally, Miller contends that record as a whole demonstrates both procedural irregularities and conflicts of interest that converged to drive Defendants' decision to terminate benefits. In particular, Miller points to the Defendants' apparent rejection of her fibromyalgia diagnoses, belated reliance on the fact that she had not remained under the regular care of a physician; reliance on a "paper-review consultant" instead of her treating physicians, disregard of the award of Social Security Disability benefits, and the failure to provide an IME to disprove her disability. Miller contends that these "irregularities" were driven by the fact that Mellon administered its own benefit plan and paid any benefits deemed owing out of its own pocket, leading to an arbitrary and capricious result. [ECF No. 58, pp. 25-27; ECF No.67, p.11-12].

The record is clear, however, that Defendants did not dispute Miller's diagnoses; instead, Defendants terminated Miller's LTD benefits because there was no evidence that these conditions disabled Miller from "any occupation" in August 2006, as required by the terms of the Plan. In the absence of such evidence, Miller no longer met the Plan definition of "Totally Disabled." Further, Defendants found that Miller failed to remain under the continual care of a treating physician after the initial grant of benefits and, therefore, she did not meet the Plan's eligibility requirements for LTD benefits. Defendants' reliance on the absence of evidence that Miller was disabled from "any occupation" after August 2006 was appropriate in terminating her LTD benefits and Plaintiff has failed to demonstrate that doing so was arbitrary and capricious.

## V.  CONCLUSION

For these reasons, the Motion for Summary Judgment submitted on behalf of the

Defendants [ECF No. 54] is granted and the Plaintiff's Motion for Summary Judgment is denied

[ECF No. 57].  An appropriate Order will follow.

                                                    BY THE COURT,


                                                    /s/   MAUREEN P. KELLY
                                                    U. S. MAGISTRATE JUDGE


Dated: September 15, 2011


cc:  All counsel of record via CM-ECF